# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **SAKEEN L. GILBERT, as administrator of the estate of TERRANCE GILBERT, Deceased,** | |
| Plaintiff, | **Case No. 15 C 11630** |
| v. | **Judge Harry D. Leinenweber** |
| **THE CITY OF CHICAGO, a municipal corporation; and CASEY KASPER,** | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This is a case involving a police shooting and claims of excessive force under the Fourth Amendment and wrongful death and battery under Illinois state law. Plaintiff Sakeena Gilbert ("Plaintiff") brought this case as the administrator of the estate of Terrance Gilbert, who was killed in the shooting. Defendants City of Chicago and Casey Kasper ("Defendants") jointly move for summary judgment (Dkt. No. 113) against Plaintiff on all claims. For the reasons stated herein, the Motion is granted.

## I. BACKGROUND

The following facts are undisputed. Terrance Gilbert ("Gilbert") lived with relatives at 450 East Marquette in Chicago. (Pl.'s Resp. to Defs.' Stmt. of Material Facts ("DSOF") ¶ 7,

Dkt. No. 129.) One of these relatives was Deecie Thompson ("Thompson"). On December 25, 2014, Gilbert called 9-1-1 from Thompson's kitchen, gave a false name, provided a description of his own clothing, and asked police to respond to 450 East Marquette. (DSOF ¶ 8). Gilbert took a steak knife from the kitchen counter, hugged Thompson and her daughter, told them not to go outside, and said "I love you. This don't have nothing to do with you all." (DSOF ¶¶ 9-11).

Two paramedics working with the Chicago Fire Department, Luis Velez ("Velez") and Robert Hickey ("Hickey"), responded first to a radio call at 450 East Marquette for a psychiatric emergency regarding a person with a knife. (DSOF ¶¶ 12-13.) Velez and Hickey arrived at about 6:48 p.m., exited the ambulance, saw Gilbert, and asked him if he was the person named in the radio call. Gilbert said no and told Velez his name was Rashad Johnson. (DSOF ¶¶ 14-15.) Velez and Hickey returned to the ambulance and waited for the police. Gilbert paced around for a time and then went to the porch, where he was seated when police arrived. (DSOF ¶¶ 16-18.)

Casey Kasper ("Kasper") and Michael Tudron ("Tudron"), both Chicago police officers working a squadrol—a combination of a squad car and ambulance—arrived at about 7:00 p.m. They had received a radio call about a person who was irate, suicidal, and armed with a knife. (DSOF ¶¶ 21-25.) Tudron drove; Kasper was the passenger.

(DSOF ¶ 25). When Kasper and Tudron arrived, Gilbert was sitting on the porch with his hands folded. (DSOF ¶ 28). Gilbert then approached the squadrol's passenger side with both hands in his waist area. (DSOF ¶¶ 29-30.) At least twice, Kasper told Gilbert to stop and take his hands out of his pants. (DSOF ¶ 31.) Gilbert stopped and took his hands out of his pants, and Kasper turned away from Gilbert to exit the squadrol. (DSOF ¶ 32.) Before Kasper could exit, Gilbert lunged on top of Kasper, knife in-hand, and stabbed him in the upper chest area, forcing him back into the squadrol. (DSOF ¶¶ 33-34.) Kasper fell on his back into the passenger seat of the squadrol. Gilbert climbed on top of Kasper and stabbed him three more times. (DSOF ¶¶ 34-37.) Kasper's bulletproof vest absorbed the worst of the attack, but he thought Gilbert was trying to stab him in the neck and tried to move away. (DSOF ¶¶ 34, 36, 39.) Kasper ultimately suffered redness and swelling on his chest but was otherwise unharmed. (PSOAF ¶ 4). Between the third and fourth stabs, Kasper slammed the door of the squadrol on Gilbert's arm. (DSOF ¶ 40.) At some point, the blade of the knife broke. (Defs.' Resp. to Pl.'s Stmt. of Add'l. Material Facts ("PSOAF") ¶ 3 Dkt. No. 132.) Kasper noticed that Gilbert continued to hold the knife but did not realize that the blade had broken. (PSOAF ¶ 9.)

Tudron ran to the rear passenger side of the squadrol and yelled "stop police." Gilbert stopped stabbing at Kasper and started to walk away. (DSOF ¶¶ 43-44.) Kasper made a radio call for backup at about 7:03 p.m. Then Kasper drew his weapon and told Gilbert to stop and drop the knife. (DSOF ¶¶ 45-47.) Gilbert turned and faced Kasper and began advancing toward him. As Gilbert advanced, Kasper saw Gilbert holding the knife near his stomach. (DSOF ¶ 54.) Kasper backed away toward the squadrol and repeatedly told Gilbert to drop the knife. Gilbert did not drop the knife, and Kasper fired two shots at Gilbert in quick succession. (DSOF ¶¶ 47-55.) Gilbert fell to the ground. At about 7:03:55 p.m., Kasper used his radio to report that shots had been fired. (DSOF ¶¶ 56, 58.) About 21 seconds passed between the radio call for backup and the radio call reporting shots fired. (DSOF ¶ 57.) Velez and Hickey then moved Gilbert to the stretcher, at which time Hickey observed Gilbert holding a knife with a black handle and a two- to three-inch metallic blade. Velez observed a "through and through" gunshot wound to Gilbert's right wrist, a gunshot wound to his abdomen, and to his head. (DSOF ¶¶ 58-60, 62.) Paramedics transported Gilbert to Stroger Hospital, where he died of his wounds. (DSOF ¶¶ 65-66.)

These events led the administrator of Gilbert's estate to bring this suit, which now includes three counts: (1) a claim under

42 U.S.C. §1983 of Fourth Amendment Excessive Force against Kasper; (2) a claim under the Illinois Wrongful Death Act against both Defendants; (3) and a battery claim under the Illinois Survival Act against both Defendants. Defendants now move for summary judgment on all claims.

## II.  STANDARD

Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). There is a genuine issue of material fact when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *See Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (internal quotations and citation omitted).

In considering this motion, the Court construes all facts and reasonable inferences in the light most favorable to the Plaintiff. *Id.* The nonmoving party must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations and citation omitted). Finally, for the nonmoving party to prevail, it must show a genuine dispute of facts that might affect the outcome at trial; "[i]rrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Id.* (internal quotations and citation omitted).

Plaintiff argues that summary judgment is "often inappropriate for cases involving excessive force" because an officer's use of force is susceptible to different interpretations. (Pl.'s Resp. to Defs.' Mtn. for Summary Judgment at 4, Dkt. No. 128). For this proposition, Plaintiff cites *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009). However, in *Catlin*, the Seventh Circuit upheld summary judgment for the Defendants because there were no material facts leaving an open question of law as to whether the use of force was reasonable. Therefore, summary judgment is not proscribed in cases with a question of excessive force. If the Court finds that there is no genuine issue for trial, it may grant summary judgment.

### III.  **DISCUSSION**

#### A.  **Disputed Facts**

As an initial matter, the Court notes that Plaintiff disputes certain of Defendants' claimed facts, and Defendants in turn argue that Plaintiff has not properly controverted their facts according to Federal Rule of Civil Procedure 56. Rule 56(c)(1) states that a party must cite "particular materials in the record" to demonstrate that a fact is in genuine dispute. Fed. R. Civ. P. 56(c)(1). The following are the significant facts Plaintiff disputes:

- Plaintiff denies that Gilbert was "flailing his arms" as he walked away after stabbing Kasper. The basis of Plaintiff's

denial is that Tudron testified that Gilbert's arms were flailing, while Valez testified that Gilbert's arms were tucked into his waistband. (DSOF ¶ 46).

- Plaintiff claims there is conflicting testimony about whether, when Gilbert turned to face Kasper, he made a lunging motion with the knife in his right hand. (DSOF ¶ 49). Plaintiff notes that Hickey testified that he did not observe a knife, and Velez testified that Gilbert's hands were in his pants during the interaction outside of the squadrol.

- Plaintiff further notes that there is conflicting testimony about how far away Gilbert was when he began moving toward Kasper. Velez testified that Gilbert was twelve feet from Kasper; Hickey said it was eight to ten; and Tudron said it was ten to fifteen. (DSOF ¶ 50).

Of the disputed facts, only the last is material and should be settled. Plaintiff is correct that there is conflicting testimony about how far Gilbert advanced toward Kasper before Kasper fired. While it is true that several of the witnesses said something different about how far Gilbert got before Kasper shot, there is no conflicting testimony about the fact that Gilbert did begin moving toward Kasper. The most Plaintiff can do is point toward Tudron's deposition, where he states that he cannot recall whether Gilbert took any steps toward Kasper. (SOAF ¶ 12). The other three witnesses who gave depositions said that Gilbert made some advance toward Kasper, though they differ in describing how far Gilbert got. Hickey testified that he saw Gilbert take a step forward. (SOAF ¶ 13.) Kasper testified that Gilbert was lunging and charging at him. (SOAF ¶ 11). And Velez testified that Gilbert began to "run forward at an accelerated pace closing the distance

between him and the officer." (Dep. of Luis Velez, 36:1-10, Exhibit C to Defs.' Mtn. for Summary Judgment, Dkt. No. 114-3). As for Tudron's inability to remember whether Gilbert moved toward Kasper, Defendants correctly point out that there is a difference between "not remembering and affirmatively stating something did not happen." (Defs.' Repl. 6, Dkt. No. 131). Thus, Tudron's answer that he does not recall whether Gilbert advanced toward Kasper at all does not create a question of whether Gilbert took steps toward Kasper. There is only a conflict regarding how far Gilbert went. Because at this stage we are required to draw all inferences in favor of the nonmoving party, the Court will assume that Gilbert was the maximum distance away from Kasper, about 15 feet, and took only one step toward Kasper.

However, as the Court will explain below, summary judgment for Defendants is appropriate.

### B. Count I: Fourth Amendment Claim

Plaintiff argues that Kasper used excessive force in violation of the Fourth Amendment when he shot and killed Gilbert. Police use of deadly force is a "seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Whether the amount of force used was reasonable depends on the "totality of the circumstances." *Id.* at 9. Particularly, this requires "careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). A person has a right not to be subjected to deadly force except under certain circumstances. Those include putting a police officer in imminent danger. *See Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015).

To determine whether an officer used excessive force, courts must use the information the officer had at the time and decide whether "the officer's use of force was objectively excessive from the perspective of a reasonable officer at the scene." *See Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018). This means evaluating the information the officer had at the time of the incident and refusing to "view the events through hindsight's distorting lens." *Id.* at 950. Further, if the use of deadly force is reasonable, the Fourth Amendment "does not require the use of the least or even a less deadly alternative." *Id.* (citing *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994)).

That said, an officer's ability to use deadly force is not everlasting. When circumstances materially change, the officer may not retain the same permissions he had just minutes or seconds before. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)

("[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity"). An individual who becomes "subdued" and is complying with an officer's orders is one against whom an officer cannot use deadly force. *See e.g., Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018).

In mapping the contours of this doctrine and in deciding which facts are material and which are unimportant, several Seventh Circuit cases are instructive. On one side, there is *Strand v. Minchuk*, 910 F.3d 909 (7th Cir. 2018). After a fistfight with a police officer, the plaintiff stepped back, put his hands in the air, and said, "I surrender. Do whatever you think you need to do. I surrender, I'm done." Immediately thereafter, the officer shot him. *Strand*, 910 F.3d at 912. The Seventh Circuit affirmed the District Court's denial of summary judgment for the Defendants. Important to the Seventh Circuit's holding was that the "police were not in hot pursuit of an individual known to be armed and dangerous. Nor had the police . . . arrived at a location only to find an individual engaged in violent or menacing conduct or acting so unpredictably as to convey a threat to anyone present." *Id.* at 917. The incident started as a scuffle over a parking ticket, and the issue for trial was how much "time elapsed between the end of

the fighting and the gunshot" and whether the plaintiff still posed a threat when the officer fired. *Id.* at 917.

On the other hand, the Seventh Circuit has routinely upheld summary judgment in favor of officers who used deadly force against a suspect who was unarmed but who the officer "reasonably believed" had committed a felony involving the threat of deadly force. *See e.g., Horton*, 883 F.3d at 951. In *Horton*, an off-duty police officer present at a pizzeria during an attempted armed robbery shot and killed an unarmed suspect, the group's lookout, as he was crawling away. *Id.* at 946. The Seventh Circuit emphasized that the officer had to react to an incident that "lasted only about 45 seconds," during which one of the assailants and the pizzeria's owner struggled over a loaded gun. *Id.* at 950–51. The Seventh Circuit found that the officer "reasonably assumed the other three assailants," including the lookout, could be armed. Further, the Seventh Circuit could not consider that the lookout was not actually armed because the officer "did not know that, and had no reasonable way to know that, at the time." *Id.* at 951. Thus, it was dispositive that the officer reasonably believed that he and others were in imminent danger and that it was possible that the suspect was armed. *Id. See also Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988) (no Fourth Amendment violation when an officer fired on a suspect because the officer "reasonably believed that

the suspect had committed a felony involving the threat of deadly force, was armed with a deadly weapon, and was likely to pose a danger of serious harm to others if not immediately apprehended").

Seventh Circuit caselaw makes clear that either Kasper or Tudron would have been justified in using deadly force against Gilbert while Gilbert was stabbing Kasper. *See e.g., Weinmann*, 787 F.3d at 449-50 ("[I]f [the plaintiff] had the gun raised to his shoulder and pointed at [the officer], then [the officer] would have been justified in using deadly force.") Accordingly, the crux of this case is whether Gilbert posed an imminent threat to Kasper as Gilbert, holding the knife, advanced toward Kasper. At summary judgment, the question is whether the Court finds, after taking all undisputed facts into account and resolving all disputes in Plaintiff's favor, that no reasonable jury could find Kasper's use of force excessive.

The facts that are material to the Fourth Amendment claim are not in dispute. The parties agree that Kasper and his partner, immediately after arriving on the scene, told Gilbert multiple times to stop what he was doing and drop the knife. The parties agree that Gilbert cornered Kasper in the squadrol, climbed on top of Kasper, and stabbed him multiple times. And it is not in dispute that Gilbert got off Kasper and started walking away, but before Gilbert got too far, he turned around, still holding part of the

knife, and took a step toward Kasper before Kasper shot. These facts are dispositive under both *Ford* and *Horton*, and Kasper's reason to believe he was in imminent danger was perhaps even stronger than in those cases. In *Ford*, the officer "did not see a weapon and was not present during the felony." *Horton*, 883 F.3d at 951 (citing *Ford*, 855 F.2d at 1275). In *Horton*, the officer "witnessed the commission of a dangerous felony" and saw someone other than the person the officer killed "make threats with a gun." *Id.* Here, Kasper experienced the commission of a dangerous felony and saw Gilbert advancing toward him with a weapon. These facts make Kasper's use of force reasonable.

The facts that Plaintiff disputes are immaterial. It does not make a difference, for example, whether Gilbert's arms were flailing or tucked into his waistband, or whether Gilbert lunged at Kasper or simply took a step toward him. Plaintiff does not argue but perhaps attempts to imply that this is evidence of Gilbert becoming subdued and complying, but the contrast between this case and *Strand* is so stark that even if Plaintiff had made the argument it would have to be rejected. Gilbert's hands, whether flailing or tucked into his waistband, were not up. He did not say "I surrender" or give any physical indication that he had surrendered or was no longer a threat. Despite being instructed to many times, he did not drop the knife. The situation was dangerous

and unfolding fast. Gilbert had just attempted to stab Kasper four times, Gilbert was coming at Kasper again, had not dropped anything and had made no indications of surrendering, despite being told multiple times to stop and drop the knife.

Finally, Plaintiff notes and Defendants admit that Kasper had a Taser. But as previously noted, Kasper was not required to use a less forceful alternative in this situation because he was justified in using deadly force. *See Horton*, 883 F.3d at 950.

In sum: because Kasper had just been stabbed multiple times, because afterward the assailant did not comply with his commands to drop the weapon and remained armed, and because the assailant took a step toward Kasper, Kasper had good reason to believe he was imminent danger. None of the other facts in dispute, regardless of how they are resolved, can change this, and therefore there is no genuine issue of material fact for trial. Defendants are entitled to summary judgment on this claim as a matter of law.

### C. Counts II and III: Illinois Wrongful Death and Illinois Survival Act – Battery Claims

Plaintiff also brings a battery claim under the Illinois Survival Act, 755 ILCS 5/27-6, and a wrongful death claim under the Illinois Wrongful Death Act, 740 ILCS 180. Under the Illinois Local Government and Local Government Employee's Tort Immunity Act, local government employees are immune from tort liability in

the "execution or enforcement of law" unless their conduct is "willful and wanton." *See* 745 ILCS 10/2-202.

Willful and wanton conduct is "a course of action which shows an actual or deliberate intention to cause harm, or if not intentional, shows an utter indifference to or conscious regard for the safety of others or their property." *Id.* This conduct occurs when a person ignores plainly dangerous conditions and does something that will probably result in injury to another and can be committed under circumstances exhibiting a reckless disregard for others' safety. *See e.g., Carter v. Chicago Police Officers*, 165 F.3d 1071, 1080–81 (7th Cir. 1998).

Although Fourth Amendment claims and claims under the Illinois Wrongful Death Act are often analyzed together, they are not necessarily coterminous. *See, e.g., DeLuna v. City of Rockford*, 447 F.3d 1008, 1013 (7th Cir. 2006). Nevertheless, the two are closely related, and a finding of reasonableness under the Fourth Amendment standard usually results in a finding that willful and wanton conduct did not occur. *See e.g., Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (same rule regarding use of force applies in both Fourth Amendment and Illinois Wrongful Death Act).

Illinois law allows the use of deadly force when the officer "reasonably believes that such force is necessary to prevent death

- 15 -

or great bodily harm to himself or such other person." 720 ILCS 6/7-5. Thus, the Court's analysis here is the same as in the Fourth Amendment claim: Kasper had just been assaulted with a steak knife, and so had every good reason to believe he was under very serious threat of death or great bodily harm to himself. Because Gilbert was not restrained or subdued, had not surrendered, was still armed, and took a step toward Kasper, Kasper's use of deadly force was justified under Illinois law. *See Wilson v. City of Chicago*, 758 F.3d 875 (7th Cir. 2014) (same showing required for Fourth Amendment and Illinois Wrongful Death Act claim in case of police shooting).

Plaintiff argues that whether Kasper's conduct was willful, and wanton is a question of fact for the jury. While it is true that some Seventh Circuit cases have said that such a determination is generally a jury question, *see Carter*, 165 F.3d at 1081, Illinois appellate courts have found that this question is one that can resolved at summary judgment if "all evidence, when viewed in the aspect most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary determination based on that evidence could ever stand." *See e.g., Urban v. Village of Lincolnshire*, 272 Ill.App.3d 1087, 1094 (Ill. App. Ct. 1995), *Stehlik v. Village of Orland Park*, 2012 IL App (1st) 091278 ¶ 20 ("Where the evidence is undisputed or susceptible to only one

possible interpretation . . . the question may be decided as a matter of law.").

Thus, the Court rejects Plaintiff's argument that this claim cannot be settled at the summary judgment stage. It finds that Kasper's actions were not willful and wanton under Illinois law, and he is thus immune from tort liability on this matter. Accordingly, the Court grants summary judgment to the Defendants as to the Illinois Wrongful Death and Battery claims.

"Shooting a man who has told you, in effect, that he is going to use deadly force against you and then moves toward you as if to do so is unquestionably an act of self-defense even if the man is attempting suicide by police." *Plakas*, 19 F.3d at 1146. This is true here, because Gilbert attempted to use deadly force against Kasper. Gilbert's death is tragic, but Kasper was undoubtedly within his right to defend himself, and no reasonable jury could find otherwise.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Dkt. No. 113) is granted on all claims.

**IT IS SO ORDERED.**

                                         Harry D. Leinenweber, Judge
                                         United States District Court

Dated: 8/28/2019